IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| THE TRAVELERS INDEMNITY | ) | |
| COMPANY, | ) | Civil No. 11-cv-01567 |
|     Plaintiff, | ) | |
| | ) | |
|     v. | ) | |
| | ) | |
| MTS TRANSPORT, LLC, | ) | |
|     Defendant/Third-Party Plaintiff | ) | |
| | ) | |
|     v. | ) | |
| | ) | |
| HALLMARK SPECIALTY | ) | |
| INSURANCE CO., | ) | |
|     Third-Party Defendant | ) | |

## MEMORANDUM OPINION

**CONTI**, District Judge.

## I. INTRODUCTION

Pending before the court are two motions for partial summary judgment, the first filed by

third-party defendant Hallmark Specialty Insurance Company ("Hallmark") (Mot. of Third Party

Def. Hallmark Specialty Ins. Co. for Summ. J. ("Hallmark's SJM")(ECF No. 88)) and the second

filed by defendant/third-party plaintiff MTS Transport, LLC ("MTS") (MTS Transport's Mot.

for Summ. J. ("MTS' SJM")(ECF No. 91)).  The lawsuit arises from a petroleum asphalt spill on

November 22, 2011. (Concise Statement of Material Facts in Supp. of Mot. for Summ. J. of

Third-Party Def. Hallmark Specialty Ins. Co. (("Hallmark CSF")(ECF No. 133) ¶ 1.) Plaintiff

Travelers Indemnity Company ("Travelers") filed an interpleader complaint[1] pursuant to 28

U.S.C. § 1335  against all defendant-claimants involved in the incident, one of which was MTS.

(Compl. (ECF No. 1) ¶ 916.) MTS filed a third-party complaint against Hallmark. (Third Party

Compl. (ECF No. 10).)  MTS, in its third-party complaint, alleged that Hallmark owes a duty to

---

[1] Travelers later filed an amended complaint (ECF No. 168) adding additional defendant-claimants.

defend MTS with respect to all claims asserted against it arising from the spill pursuant to an excess liability insurance policy issued by Hallmark to MTS. (Id. ¶ A.)

This court exercises diversity jurisdiction over Travelers' interpleader action pursuant to 28 U.S.C. § 1335 because at least two citizens of diverse states or nations claim to be entitled to at least $500 of the benefits arising by virtue of the policy issued by Travelers (Compl. (ECF No. 1) ¶ 1012) and Travelers paid the value of that policy into this court's registry (Receipt from Travelers Indem. Co. for Interpleader Funds (ECF No. 9)). This court exercises supplemental jurisdiction over MTS' third-party complaint filed against Hallmark pursuant to 28 U.S.C. § 1367.

MTS filed a motion to expedite a summary judgment schedule on December 23, 2011. (Mot. for Expedited Pleading and Summ. J. Schedule (ECF No. 16).) The motion was granted after a hearing held on January 25, 2012. Hallmark and MTS stipulated that discovery with respect to the third-party complaint would be stayed pending resolution of their cross-motions for summary judgment. (Stipulation (ECF No. 37).) Hallmark and MTS filed cross-motions for summary judgment on February 24, 2012. (Hallmark's SJM (ECF No. 88); MTS' SJM (ECF No. 91)). Hallmark argues that the pollution exclusion clause in its policy bars coverage for the claims asserted against MTS. (Hallmark's Br. (ECF No. 89) at 11.) Hallmark advocates for the application of Pennsylvania law in interpreting the insurance contract, but contends that, even if this court applies Maryland law, the petroleum asphalt spill falls within the scope of the pollution exclusion clause. (Id. at 17-19.)

MTS argues that Maryland law should apply to govern the interpretation of the insurance contract and its pollution exclusion clause. (MTS' Br. (ECF No. 92) at 3-5.) MTS points out that, under Maryland law, pollution exclusion clauses do not apply to cases outside of "traditional

2

environmental pollution." (Id. at 8-9.) It contends that the petroleum asphalt spill is not a case of traditional environmental pollution, and, therefore, Hallmark owes a duty to indemnify MTS for the claims arising from the spill. (Id. at 5, 14.)

Because Maryland law applies and no reasonable jury would render a verdict in favor of Hallmark, MTS' motion for summary judgment (ECF No. 91) will be GRANTED.  Hallmark's motion for summary judgment (ECF No. 88) will be denied.

## II.   FACTUAL BACKGROUND

This matter arises out of an incident which occurred on November 22, 2011.  (Hallmark CSF (ECF No. 133) ¶ 1.)   On that date, a tanker-truck leaked Marathon Petroleum Asphalt from milepost 10 to milepost 48 of the Pennsylvania Turnpike (the "turnpike'). (Hallmark CSF (ECF No. 133) ¶ 2; Compl. (ECF No. 1) ¶ 999.) This spill caused damage to the turnpike and the motor vehicles of more than 1,000 claimants travelling upon the turnpike at the time of the spill. (Hallmark CSF (ECF No. 133) ¶¶ 4,5; Amend. Compl. (ECF No. 168-1) ¶¶ 3-1095.)  The tanker-truck was owned and operated by MTS, a hauler of asphalt. (Hallmark CSF (ECF No. 133) ¶ 3; Exs. in Support of Br. in Support of Mot. for Summ. J. of Third Party Def. Hallmark Specialty Ins. Co. ("Hallmark Exs.") (ECF 90) Ex. B. at 1.)  MTS is located in the state of Maryland. (Compl. (ECF No. 1) ¶ 916; Third-Party Compl. (ECF No. 10) ¶ 1; MTS' CSF (ECF No. 131) ¶ 19; Hallmark's CSF (ECF No. 133) ¶ 29.)[2]

At the time of the spill, MTS' trucking operations were covered by a $1,000,000 primary liability policy issued by Travelers—Policy No. Y-840-8742R763-IND-11 (Hallmark Exs. (ECF No. 90) Ex. D)—and a $4,000,000 excess liability policy issued by Hallmark—Policy No. 77HX1113E0 (Hallmark Exs. (ECF No. 90) Ex. B).  Travelers is a Connecticut corporation with

---

[2] Although MTS asserts the driver of the truck involved was a domiciliary of the state of Maryland. (Hallmark CSF (ECF No. 133) ¶ 30), MTS did not provide the court with any record evidence of the driver's domicile.

its principal place of business in Hartford, Connecticut.   (Compl. (ECF No. 1) ¶ 1.)  Hallmark is

an Oklahoma corporation with its principal place of business in Fort Worth, Texas (Ans. with

Affirmative Defs. of Third Party Def. Hallmark Specialty Ins. Co. to the Third Party Compl. Of

Def./Third Party Pl. MTS Transport, LLC ("Hallmark's Ans.") (ECF No. 63) ¶ 2). The following

addresses are listed on the policy: Hallmark Specialty Insurance Co., 777 Main St., Suite 1000,

Fort Worth, TX 76102 and MTS Transport, LLC, 101 Log Canoe Circle, Ste 1, Stevensville, MD

21666. (Hallmark Exs. (ECF No. 90) Ex. B.)  The policy states that it covers accidents across the

United States and its territories and Canada. (Id., "Coverage Territory Limitation.")  The policy

also includes Endorsement HB 190 01 10 09 (10-09), entitled "Maryland Changes –

Cancellation, Nonrenewal And State Required Conditions." (Id.)[3]

On December 9, 2011, as a result of the accident, Travelers filed an interpleader action,

seeking leave of the court to pay its $1,000,000 policy limits into the court's registry. (Hallmark

CSF (ECF No. 133) ¶ 8.) Travelers acknowledged in its complaint that the damages for cleanup

claimed by the Pennsylvania Turnpike Commission would exceed the policy limits. (Compl.

(ECF No. 1) ¶ 1003.)  Travelers sought to fulfill its obligations to MTS under the terms of its

policy through this deposit. (Amended Compl. (ECF No. 168-1) ¶ 1115.)

Hallmark, whose excess liability policy will activate after Travelers' policy limits are

exceeded, issued a reservation of rights letter advising MTS that this spill potentially fell under

the pollution exclusion in the policy. (Hallmark Exs. (ECF No. 90) Ex. F.) If further

investigation confirmed that this exclusion applied, Hallmark stated it would not be liable for any

damages resulting from the spill. (Id. at 3-4.)  MTS filed a third-party complaint against

---

[3] Although not in the factual record, Hallmark and MTS assumed the policy was issued and delivered in Maryland. (Response Br. in Opp'n to Def./Third Party Pl. MTS Transport's Mot. for Summ. J. ("Hallmark's Opp'n Memo.") (ECF No. 120) at 6.) The court will make the same assumption under the flexible rules applicable to the conflict of laws  analysis discussed *infra*.

Hallmark, seeking a declaratory judgment. (Third-Party Compl. (ECF No. 10).) Hallmark, in

response, issued a second reservation of rights letter. (Hallmark Exs. (ECF No. 90) Ex. G.)  The

relevant policy language referenced by these letters is as follows:

> **RELEVANT POLICY LANGUAGE**
> **EXCESS LIABILITY POLICY**
> WE, the Company named in the Declarations, relying upon the statements shown on the Declarations page and in the Schedule of UNDERLYING INSURANCE attached to this policy and in return for the payment of the premium and subject to the terms, conditions, exclusions, and limits of insurance of this policy, agree with YOU as follows:
>
> **SECTION I**
> **INSURING AGREEMENTS**
>
> A.      Coverage
> This insurance only applies to injury or damage covered by the UNDERLYING INSURANCE, and that takes place during OUR policy period.  WE will pay on YOUR behalf the ULTIMATE NET LOSS in excess of the applicable limits of the UNDERLYING INSURANCE listed in the attached Schedule of UNDERLYING INSURANCE (whether such insurance is collectible or not).  If the UNDERLYING INSURANCE does not pay a loss for reasons other than the exhaustion of an aggregate limit of insurance, then WE shall not pay such loss.
>
> The Definitions, Terms, Conditions, Limitations, and Exclusions of the UNDERLYING INSURANCE, in effect at the inception date of this policy, apply to this coverage unless they are inconsistent with provisions of this policy, or relate to premium, subrogation, any obligation to defend, the payment of expenses, limits of insurance, cancellation or any renewal agreement.
> . . . .
> **SECTION II (EXCLUSIONS)**
> **WHAT IS NOT COVERED BY THE POLICY**
>
> This insurance does not apply:
>      . . . .
> H. 1.   To any injury, damage, expense, cost, loss, liability or legal obligation arising out of or in any way related to pollution, however caused.
> To any loss, cost or expense arising out of any:

a.      directive, request, demand or order that any INSURED or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of pollutants; or

b.      claim or SUIT by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to or assessing the effects of pollutants.

. . . .

Pollution includes the actual, alleged or potential presence in or introduction into the environment of any substance, including pollutants, if such substance has or is alleged to have the effect of making the environment impure, harmful, or dangerous. Environment includes any air, land, structure or the air therein, watercourse or water, including underground water.

Pollutants include any solid, liquid, gaseous, or thermal irritant or contaminant including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste.  Waste includes material to be recycled, reconditioned or reclaimed.

(Hallmark Exs. (ECF No. 90) Ex. B.)

Marathon Petroleum Asphalt, according to the Material Safety Data Sheet ("MSDS")

(Hallmark Exs. (ECF No. 90) Ex. C) provided by Marathon Petroleum Company LP, is "a solid

carbon material produced from high temperature vacuum distillation of crude oil . . . [and] [c]an

contain minor amounts of sulfur, nitrogen and oxygen compounds. . . .  Composition [of

petroleum asphalt] varies depending on source of crude. . . .   Different asphalt grades may also

contain an anti-stripping additive" (Id).  The MSDS provides a number of warnings regarding

inhalation and ingestion of and skin and eye contact with the asphalt, including warnings that: (a)

thermal burns may result from contact with heated asphalt; (b) reddening, itching and

inflammation of skin may occur on contact; and (c) eye irritation and sensitivity to light may

result. (Id. at 2.)  The asphalt can also contain trace amounts of hydrogen sulfide, which is highly

toxic and may be fatal if inhaled. (Id.)  The asphalt has been determined by the International

Agency for Research on Cancer to be carcinogenic to animals. (Id.)

6

Among other claimants in this interpleader, the Pennsylvania Turnpike Commission has a claim for expenses with respect to the cleanup of the spilled asphalt. (Compl. (ECF No. 1) ¶ 1003; MTS' CSF (ECF No. 131) ¶ 8.)  Outside of the highway cleanup, MTS asserts that, at this time, there have been no allegations or claims that the asphalt came into contact with any land or waterway, was leaked into a contained or unvented area, or was inhaled, ingested, or came into contact with the eyes or skin of any individual.  (MTS' CSF (ECF No. 131) ¶¶ 9-11; Hallmark's CSF (ECF No. 133) ¶¶ 25-27.)  Hallmark acknowledges that Travelers' complaint does not contain any such allegations, but denies the implication that there will be no such claims made in the future.  Hallmark argues this implication is not supported by the record. (Id.)  MTS asserts that there have been no environmental claims, citations, or actions made by the Environmental Protection Agency,  the Pennsylvania Department of Environmental Protection, or any other government environmental agency.  (MTS' CSF (ECF No. 131) ¶ 12; Hallmark's CSF (ECF No. 133) ¶ 28.)  Hallmark disputes this assertion, arguing it is not supported by the record. (Id.)  This court is unaware of any allegations, claims, or citations outside of those included in Travelers' complaint at this time.

III.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides in relevant part:

**(a) Motion for Summary Judgment or Partial Summary Judgment.**

> A party may move for summary judgment, identifying each claim or defense — or the part of each claim or defense — on which summary judgment is sought.  The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  The  court should state on the record the reasons for granting or denying the motion.
>
> . . . .

**(c) Procedures.**

7

      **(1)** ***Supporting Factual Positions***. A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

> **(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> **(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

FED. R. CIV. P. 56.

> Rule 56 of the Federal Rules of Civil Procedure "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."

Marten v. Godwin, 499 F.3d 290, 295 (3d Cir. 2007) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986)).

      An issue of material fact is in genuine dispute if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see Doe v. Abington Friends Sch., 480 F.3d 252, 256 (3d Cir. 2007) (citing Anderson, 477 U.S. at 248–52); Celotex Corp., 477 U.S. at 322–26) ("A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof."). The Supreme Court held in Celotex Corp. that:

> In cases like the instant one, where the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the "pleadings, depositions, answers to interrogatories, and admissions on file." Such a motion, whether or not accompanied by affidavits, will be "made and supported as provided in this rule," and Rule 56(e) therefore requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial."

<u>Celotex Corp.</u>, 477 U.S. at 324 (emphasis added).  There must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." <u>Anderson</u>, 477 U.S. at 249-50 (citations omitted).  The United States Supreme Court later emphasized:

> "[W]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"

<u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007) (quoting <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586–87 (1986)).

In deciding a summary judgment motion, a court must view the facts in the light most favorable to the nonmoving party and must draw all reasonable inferences and resolve all doubts in favor of the nonmoving party.  <u>Woodside v. Sch. Dist. of Philadelphia Bd. of Educ.</u>, 248 F.3d 129, 130 (3d Cir. 2001); <u>Doe v. Cnty. of Ctr.</u>, 242 F.3d 437, 446 (3d Cir. 2001); <u>Heller v. Shaw Indus., Inc.</u>, 167 F.3d 146, 151 (3d Cir. 1999).  A court must not engage in credibility determinations at the summary judgment stage.  <u>Simpson v. Kay Jewelers, Div. of Sterling, Inc.</u>, 142 F.3d 639, 643 n.3 (3d Cir. 1998).

## IV.   CHOICE-OF-LAW RULES

Hallmark and MTS dispute which law is applicable to the interpretation of the pollution exclusion clause in the insurance policy issued by Hallmark to MTS.  MTS argues that Maryland law should be applied, whereas Hallmark argues in favor of Pennsylvania law.  In a diversity case, the choice-of-law rules of the forum state are to be applied by federal courts.  <u>E.g.</u>, <u>Klaxon v. Stentor Elec. Mfg. Co.</u>, 313 U.S. 487 (1941); <u>Hammersmith v. TIG Ins. Co.</u>, 480 F.3d 220, 226 (3d Cir. 2007). Thus, this court is obligated to apply Pennsylvania choice-of-law rules. Prior

to <u>Griffith v. United Airlines, Inc.</u>, 203 A.2d 796 (Pa. 1964), Pennsylvania choice-of-law rules

were the laws of *lex loci contractus* (place of contract) and *lex loci delicti* (place of injury).

<u>Hammersmith</u>, 480 F.3d at 227. In <u>Griffith</u>, the Pennsylvania Supreme Court abandoned the

strict *lex loci delicti* rule. <u>Griffith</u>, 203 A.2d at 806.  The court adopted a "more flexible rule

which permits analysis of the policies and interests underlying the particular issue before the

court." <u>Id.</u> at 805.  The Court of Appeals for the Third Circuit noted that the flexible <u>Griffith</u> rule

combines the "'approaches of both [the] Restatement II (contacts establishing significant

relationships) and 'interests analysis' (qualitative appraisal of the relevant States' policies with

respect to the controversy).'" <u>Hammersmith</u>, 480 F.3d at 231 (quoting <u>Melville v. Am. Home</u>

<u>Assurance Co.</u>, 584 F.2d 1306, 1311 (3d Cir. 1978)); <u>see</u> <u>Berg Chilling Systems, Inc. v. Hull</u>

<u>Corp.</u>, 435 F.3d 455, 463 (3d Cir. 2006).

 Although <u>Griffith</u>, which dealt with a tort action, abandoned the *lex loci delicti* rule, 203

A.2d at 805, the Pennsylvania Supreme Court has not yet applied the <u>Griffith</u> standard to a

contract action.  <u>Hammersmith</u>, 480 F.3d at 228 (citing <u>Budtel Assocs., LP v. Cont'l Cas. Co.</u>,

915 A.2d 640 (Pa. Super. Ct. 2005)).  Courts have, therefore, struggled to determine whether the

*lex loci contractus* rule is still considered Pennsylvania law. <u>Id.</u> at 227.  The majority of

authorities at both the state and federal level, however, have applied the <u>Griffith</u> standard to

contract actions. <u>Id.</u> at 227-28 (citing <u>Gen. Star Natl. Ins. Co. v. Liberty Mut. Ins. Co.</u>, 960 F.2d

377 (3d Cir. 1992);  <u>Compagnie des Bauxites de Guinee v. Argonaut-Midwest Ins. Co.</u>, 880 F.2d

685 (3d Cir. 1989); <u>Am. Contract Bridge League v. Nationwide Mut. Fire Ins. Co.</u>, 752 F.2d 71

(3d Cir. 1985); <u>Wilson v. Transport Ins. Co.</u>, 889 A.2d 563 (Pa. Super. Ct. 2005)); <u>McCabe v.</u>

<u>Prudential Prop. & Cas. Ins. Co.</u>, 514 A.2d 582 (Pa. Super. Ct. 1986); <u>but see</u> <u>Canal Ins. Co. v.</u>

<u>Underwriters at Lloyd's London</u>, 435 F.3d 431, 434 (3d Cir. 2006) (citing <u>Crawford v.</u>

Manhattan Life Ins. Co., 221 A.2d 877, 880 (1966) ("an insurance contract is governed by the law of the state in which the contract was made."). The Court of Appeals for the Third Circuit stated in Hammersmith: "[I]t is now clear that Pennsylvania applies the more flexible 'interest/contacts' methodology to contract choice-of-law questions." Id. at 226-27.

A.     **Conflict of Laws**

Before applying this "interest/contacts" methodology (the "Griffith test"), the court must determine whether a conflict exists between the laws of the states in question. Id. at 230. If no conflict exists, the court is free to apply either state's law because the result will not change. Id. at 229 (citing Huber v. Taylor, 469 F.3d 67, 74 (3d Cir. 2006)). If a conflict does exist, the court must determine the type of conflict. Id. at 230. The Court of Appeals for the Third Circuit has recognized three classifications of conflicts—"true," "false," and "unprovided-for." Id. Unprovided-for conflicts are those in which neither state's interests would be impaired regardless which state's laws were applied. Id. In such a case, the court should apply the *lex loci* contractus rule. Id. at 230 n.9 (citing Garcia v. Plaza Oldsmobile LTD., 421 F.3d 216, 220 (3d Cir. 2005)). False conflicts are those in which only one state's interests would be impaired by the application of the other state's laws. Id. at 229-30. In such a case, the potentially impaired state's law should be applied. Id. (citing Lacey v. Cessna Aircraft Co., 932 F.2d 170, 187 (3d Cir. 1991)). True conflicts are those in which both states' interests would be impaired by the application of the other state's law. Id. at 230. In such a case, the court must apply the Griffith test to determine which state has "the most significant relationship to the insurance contract, and greatest governmental interest in seeing its laws enforced . . . ." Id. at 235.

In determining whether to use Pennsylvania or Maryland law to interpret the insurance contract between MTS and Hallmark, the court finds there is a clear conflict between

Pennsylvania and Maryland law with respect to the scope and application of absolute pollution

exclusion clauses (the standard pollution exclusion clauses included in general commercial

liability policies).  Under Pennsylvania law, absolute pollution exclusion clauses are interpreted

broadly, and, although ambiguities are strongly construed against the insurer, Pennsylvania

courts have found fewer ambiguities with respect to what materials are considered pollutants.

Compare Lititz Mut. Ins. Co. v. Steely, 785 A.2d 975, 980 (Pa. 2001) (holding a pollution

exclusion unambiguously included lead paint as a pollutant) with Sullins v. Allstate Ins. Co., 667

A.2d 617, 623 (Md. 1995) (holding a similarly drafted pollution exclusion clause to be

ambiguous regarding the inclusion of lead paint as a pollutant); see Reliance Ins. Co. v.

Moessner, 121 F.3d 895, 901 (3d Cir. 1997) (citing O'Brien Energy Sys. v. Am. Employers' Ins.

Co., 629 A.2d 957 (Pa. Super. Ct. 1993); Lower Paxton Twp. v. U.S. Fid. & Guar. Co., 557 A.2d

393 (Pa. Super. Ct. 1989); Techalloy Co. v. Reliance Ins. Co., 287 A.2d 820 (Pa. Super. Ct.

1984)) ("At the outset we note that the Pennsylvania Superior Court has consistently interpreted

pollution exclusion clauses to be clear and unambiguous.  In so doing, the Court has interpreted

pollution exclusion clauses broadly.").  Maryland courts have found absolute pollution exclusion

clauses to be ambiguous unless applied to "traditional environmental pollution situations."

Clendenin Bros., Inc. v. U.S. Fire Ins. Co., 889 A.2d 387, 398 (Md. 2006); see Sullins, 667 A.2d

at 623 ("the insurance industry intended the pollution exclusion to apply only to environmental

pollution"); compare with Brown v. Am. Motorists Ins. Co., 930 F. Supp. 207, 208 (E.D. Pa.

1996), aff'd, 111 F.3d 125 (3d Cir.), cert. denied, 522 U.S. 950 (1997) ("Whether or not fumes

from a household product would commonly be understood as a pollutant is not the issue . . ."

when determining whether something is a pollutant).

Because it is clear that there is an actual conflict between the laws of Pennsylvania and Maryland regarding the interpretation of insurance contracts and pollution exclusion clauses, the court must classify the conflict as "true," "false," or "unprovided-for" based on the states' interests in the application of their laws.  MTS contends that a false conflict exists because Maryland has an interest in enforcement of its standards for insurance contracts issued in its state to ensure protection for its residents (such as MTS). (MTS Transport's Amend. Memo. of Law in Opposition to Hallmark Specialty Ins. Co.'s Mot. for Summ. J. ("MTS' Opposition Memo") (ECF No. 123) at 5-6.)  Hallmark asserts the opposite, arguing that a false conflict exists because Maryland "has no interest in the extent of the protection afforded by insurers to persons and property in Pennsylvania." (Hallmark's Br. (ECF No. 89) at 7.)

MTS is correct in asserting that Maryland has an interest in the application of its law to ensure consistent protection of its residents under contracts issued in its borders. Vaughan v. Nationwide Mut. Ins. Co., 702 A.2d 198, 202 (D.C. App. 1997) (citing Hercules & Co., Ltd.  v. Shama Rest. Corp., 566 A.2d 31, 41 (D.C. App. 1989) ("Maryland has an interest in protecting the expectations of Maryland residents who are parties to a contract.").  Here MTS is a Maryland resident with a liability policy issued in Maryland.  MTS, however, is not correct in asserting that a false conflict exists; Pennsylvania, according to the standard recognized by the Court of Appeals for the Third Circuit, also has an interest in a situation like this case.  In Hammersmith, the Court of Appeals for the Third Circuit held that the state of New York had an interest in the application of its law that protected insurers from liability despite the insurance company in the case not being a resident of New York. 480 F.3d at 232. The court stated that kind of rule is intended to protect all insurers, not just resident insurers. Id.  In the same way, Pennsylvania has an interest in applying its law that maintains, as Hallmark characterized it, the "sanctity of

contract," a rule that protects insurers like the rule referenced in <u>Hammersmith</u>.  Because a true conflict exists and both states have contrary interests to be served, the court must apply the <u>Griffith</u> test to determine which state's interests should govern.

      **B.**     **Application of the <u>Griffith</u> Test**

      1.     Section 188 of the Restatement (Second) of Conflict of Laws

The first step in the <u>Griffith</u> test is the application of the Restatement (Second) of Conflict of Laws (1971).  The restatement includes a contacts test specific to contracts of fire, surety, or casualty insurance, which provides:  "The validity of a contract of fire, surety or casualty insurance and the rights created thereby are determined by the local law of the state which the parties understood was to be the principal location of the insured risk during the term of the policy . . . ." <u>Id.</u> § 193; <u>see</u> <u>Hammersmith</u>, 480 F.3d at 233; <u>Manor Care, Inc. v. Cont'l Ins. Co.</u>, No. Civ.A. 01-CV-2524, 2003 WL 22436225, at *6 (E.D. Pa. Oct. 27, 2003) (first applying section 193 to a Pennsylvania-Maryland conflict of laws question).  The comments, however, clarify that, where the insurance policy is covering "things, such as ships, trucks, airplanes and railroad cars, that are constantly on the move from state to state," this section is inapplicable considering there can be no principal location of the insured risk for an object constantly moving across state borders.  R<small>ESTATEMENT</small> (S<small>ECOND</small>) C<small>ONFLICT OF</small> L<small>AWS</small> § 193 cmt. a.

When a specific section such as section 193 does not apply, the court must look to the general contacts test, <u>Hammersmith</u>, 480 F.3d at 233; <u>see</u> <u>Manor Care</u>, 2003 WL 22436225, at *7, which is set forth in section 188 of the Restatement (Second) of Conflict of Laws.

      <u>Law Governing in Absence of Effective Choice by the Parties</u>

      (1) The rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with

14

respect to that issue, has the most significant relationship to the transaction and the parties under the principles stated in § 6.

(2) In the absence of an effective choice of law by the parties (see § 187), the contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

    (a) the place of contracting,

    (b) the place of negotiation of the contract,

    (c) the place of performance,

    (d) the location of the subject matter of the contract, and

    (e) the domicil, residence, nationality, place of
       incorporation and place of business of the parties.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

(3) If the place of negotiating the contract and the place of performance are in the same state, the local law of this state will usually be applied, except as otherwise provided in §§ 189-199 and 203.

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188 (1971). The contacts listed in section 188(2) are explained in comment "e". Id. cmt. e. The place of contracting is "the place where occurred the last act necessary . . . to give the contract binding effect"; the place of negotiation is "where the parties negotiate and agree on the terms of their contract"; and the place of performance is "[t]he state where performance is to occur under a contract." Id. The place of performance for insurance contracts may be the state in which the insurance premium is paid or the state in which the insurer is obligated to defend the insured. Specialty Surfaces Intern., Inc. v. Contl. Cas. Co., 609 F.3d 223, 234 (3d Cir. 2010) (determining that, under Restatement (Second) of Conflict of Laws § 188, the places of performance of an insurance contract are where (a) the insured paid its premiums (citing, e.g., Armotek Indus., Inc. v. Employers Ins. of

Wausau, 952 F.2d 756, 761 (3d Cir. 1991)) or (b) where the insurer is obligated to defend (citing

Hartford Underwriters Ins. Co. v. Found. Health Servs., Inc., 524 F.3d 588, 596 (5th Cir. 2008);

cf. Northern Ins. Co. of N.Y. v. Allied Mut. Ins. Co., 955 F.2d 1353, 1360 (9th Cir. 1992)).

The location of the subject matter of the contract is relevant "[w]hen the contract deals

with a specific physical thing, such as land or a chattel, or affords protection against a localized

risk," and the domicil, residence, nationality, places of incorporation and places of business of

the parties "are all places of enduring relationship to the parties" and, therefore, considered

among the contacts. RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188 cmt. e. These

contacts are to be evaluated qualitatively based on the circumstances surrounding the contract.

Id. (discussing scenarios in which each contact could be significant or insignificant depending on

the circumstances); see Hammersmith, 480 F.3d at 231. Furthermore, the contacts are only

relevant if they relate to "'the policies and interest underlying the particular issue before the

court.'" Cippola v. Shaposka, 267 A.2d 854, 856 (Pa. 1970) (quoting Griffith, 203 A.2d at 805).

The second step in the Griffith test is to perform the interests analysis. This analysis

weighs the governmental interests of the states involved in the controversy to determine which

state has the greatest interest in having its laws enforced.  Hammersmith, 480 F.3d at 235.  The

Court of Appeals for the Third Circuit has considered an array of interests in cases involving

insurance claims, including a state's interest in ensuring adequate coverage for its residents, id. at

235, and recovery for its injured victims, Melville, 584 F.2d at 1314, in regulating insurance

corporations and their contracts, Hammersmith, 480 F.3d at 235, in preventing contractual

forfeiture, Compagnie, 880 F.2d at 691, and even in reducing insurance premiums.  Melville, 584

F.2d at 1313.  By using a flexible method of analysis, the result "will not be chaotic and anti-

rational." Griffith, 203 A.2d at 806.  The flexibility of that approach allows courts to apply the

law of the state with the most significant interest in the outcome. <u>Hammersmith</u>, 480 F.3d at 227 (citing <u>Griffith</u>, 203 A.2d at 806).

The Restatement (Second) of Conflict of Laws § 193 is not applicable to this case.  MTS acknowledged that its "business requires its tractor trailers to travel through other States, [and] it could be argued that the 'policy covers a group of risks scattered throughout two or more States' such that the risk is not 'located principally in a single State.'" (MTS' Opp'n Mem. (ECF No. 123) at 8 (quoting <u>Manor Care</u>, 2003 WL 22436225, at *6 (citing RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 193 cmt. b)).)  Because section 193 is inapplicable, the court must consider Restatement (Second) of Conflict of Laws § 188.  Under section 188(3), where the place of negotiation and performance are in the same state, that state's laws will usually be applied.  <u>Id.</u> In light of the Court of Appeals for the Third Circuit's holding in <u>Specialty Services</u>, the place of performance can be either where the premiums were paid (performance by the insured) or where the insurer is obligated to defend the insured (performance by the insurer), making both Maryland and Pennsylvania eligible to be a place of performance in this case.  <u>See</u> 609 F.3d at 234.  Under those circumstances, the court must evaluate all the considered contacts from Restatement (Second) of Conflict of Laws § 188(2).

The Restatement (Second) of Conflict of Laws § 188(2) considers the following contacts: "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicil, residence, nationality, place of incorporation and place of business of the parties."  <u>Id.</u>  There is limited information in the record with respect to several of the identified contacts.  The court understands that the pleading and summary judgment schedule was expedited and discovery was stayed. (Mot. to Expedite Pleading and Summ. J. Schedule ("Expedite Schedule Mot.")(ECF No.

17

16)); (Case Management Order – Summ. J. (ECF No. 116)); (Stipulation (ECF No. 37) ¶ 2.)
There, however, is enough information of record for the court to conclude that Maryland law is
applicable to the policy.

With respect to the place of contracting, neither Hallmark nor MTS disputed that the
policy was issued and delivered to MTS in Maryland, making that the place of contracting.
(Hallmark's Opp'n Mem. (ECF No. 120) at 6 n.3.)  With respect to negotiation, the record
reflects that Hallmark and MTS agreed to include an endorsement making Maryland's
cancellation and renewal laws applicable to the policy.  Endorsement HB 190 01 10 09 (1009) of
the policy issued by Hallmark is entitled  "Maryland Changes – Cancellation, Nonrenewal and
State Required Conditions.  (Hallmark Ex. (ECF No. 90) Ex. B); see Hammersmith, 480 F.3d at
234 (holding New York was the place of negotiation in part because there was no evidence of
negotiations having taken place in Pennsylvania).  There is no assertion that negotiations took
place in Pennsylvania and there is no evidence that indicates where the negotiations actually took
place.

With respect to the place of performance, it was already noted that the place of
performance could be considered both Maryland and Pennsylvania based on the Court of
Appeals for the Third Circuit's reasoning in Specialty Services, making this contact neutral in
the conflicts analysis.  609 F.3d at 234.  The location of the subject matter of the contract is a
neutral contact as well; the policy coverage spreads across the United States and its territories
and Canada according to the policy issued by Hallmark. (Hallmark Exs. (ECF No. 90) Ex. B,
"Coverage Territory Limitation" at 4 ("This insurance does not apply to any liability arising out
of an OCCURRENCE outside of the United States of America, its territories or possessions, or
Canada.").)  With respect to the domicil, residence, nationality, place of incorporation and place

of business of the parties, MTS is located in Maryland.[4]   (Hallmark CSF (ECF No. 133) ¶ 29; Hallmark's App'x (ECF No. 94-4); (Third-Party Compl. (ECF No. 10) ¶ 1).  Hallmark is incorporated in Oklahoma and Texas is its principal place of business. (Hallmark's Answer (ECF No. 63) ¶ 2).

Analysis of the contacts identified in section 188(2) of the Restatement (Second) Conflict of Laws indicates that Maryland's contacts with the parties and the contract are more significant than those of Pennsylvania, whose only contact is that it is the place of injury, a contact abandoned by the Griffith test.  The court, therefore, finds that application of the Restatement (Second) of Conflict of Laws § 188(2) favors Maryland law.

2.   Interests Analysis

The court must perform the interests analysis, weighing the governmental interests of Maryland and Pennsylvania to determine which state has the greatest interest in having its laws enforced in the context of this case.  Maryland, being the state in which the contract was issued and delivered and the state in which the insured, MTS, is located, has a number of interests at stake.  Notably, Maryland has a significant interest in seeing its law govern contracts issued in its state to ensure consistency and predictability for its citizens.  Maryland has an interest in protecting businesses like MTS that purchase insurance policies and are located in Maryland by recognizing broader insurance coverage for those businesses to operate without undue concern that damage claims from accidents might impact their financial viability.  Pennsylvania, on the other hand, has only an interest in protecting insurers.  This interest is outweighed by

---

[4] MTS and Hallmark agree that MTS is located in Maryland, but the record evidence does not address the state in which MTS is organized.  According to the commentary to section 188(2), "with respect to most issues, a corporation's principal place of business is a more important contact than the place of incorporation." RESTATEMENT (SECOND) CONFLICT OF LAWS § 188, cmt. e.  As noted, Hallmark admitted that MTS is "located" in Maryland.  (Hallmark CSF (ECF No. 133)  ¶ 29.)  In this context the court considers that the use of the term "located" connotes from where MTS'business is conducted.  In other words, since no other location for MTS' business is described, MTS' principal place of business is located in Maryland.

Pennsylvania's interest in ensuring recovery for its injured citizens, an interest best served in this case through application of Maryland law. See Budget Rent-A-Car System, Inc. v. Chappell, 407 F.3d 166, 177 (3d Cir. 2005) (applying Pennsylvania choice-of-law rules in determining New York's interest in ensuring recovery for its injured citizen strongly outweighed Michigan's interest in limiting a company's liability).  After considering the interests of Maryland and Pennsylvania the court concludes that the interests of Maryland outweigh Pennsylvania's interests.  Therefore, this second step of the Griffith test, like the first step, points to the application of Maryland law.  Under those circumstances, the court will apply Maryland law to the present dispute.

## V.   INTERPRETATION OF POLLUTION EXCLUSIONS UNDER MARYLAND LAW

Under Maryland law, a two-pronged "analytical paradigm" is used for the interpretation of insurance contracts.  Clendenin, 889 A.2d at 393.  First, the court is to determine the intended scope and limitations of coverage under the insurance policy. Id. Second, the court is to determine whether the allegations in the case potentially fall under the scope intended at the time of contracting.  Id.  When interpreting insurance contracts, Maryland courts do not automatically default to construe insurance policies strongly against the insurer.  Id.

> Rather, following the rule applicable to the construction of contracts generally, we hold that the intention of the parties is to be ascertained if reasonably possible from the policy as a whole.  In the event of an ambiguity, however, extrinsic and parol evidence may be considered.  If no extrinsic or parol evidence is introduced, or if the ambiguity remains after consideration of extrinsic or parol evidence that is introduced, it will be construed against the insurer as the drafter of the instrument.

Cheney v. Bell Nat. Life Ins. Co., 556 A.2d 1135, 1138 (Md. 1989); see  Clendenin, 889 A.2d at 394; Sullins, 667 A.2d at 619.

Language in a contract can be ambiguous in two ways:

> "(1) It may be intrinsically unclear, in the sense that a person reading it without the benefit of some extrinsic knowledge simply cannot determine what it means; or (2) its intrinsic meaning may be fairly clear, but its application to a particular object or circumstance may be uncertain."

Bernhardt v. Hartford Fire Ins. Co., 648 A.2d 1047, 1052 (Md. Ct. Spec. App. 1994) (quoting

Town & Country v. Comcast Cablevision, 520 A.2d 1129, 1132-33 (Md. Ct. Spec. App. 1987);

see Sullins, 667 A.2d at 619 ("A term which is clear in one context may be ambiguous in

another.") (citing Tucker v. Fireman's Fund Ins. Co., 517 A.2d 730, 732 (Md. 1986)).

Ambiguities are determined from the point of view of a reasonably prudent person reading the

contract.  Cole v. State Farm Mut. Ins., 753 A.2d 533, 537 (Md. 2000) ("A term of a contract is

ambiguous if, to a reasonably prudent person, the term is susceptible to more than one

meaning.") (citing Pacific Indem. Co. v. Interstate Fire & Cas. Co., 488 A.2d 486, 489 (Md.

1985); St. Paul Fire & Marine Ins. Co. v. Pryseski, 438 A.2d 282, 288 (Md. 1981); Truck Ins.

Exch. v. Marks Rentals, 418 A.2d 1187, 1190 (Md. 1980)).

### A.  Intended Scope and Coverage

Using this two-pronged analytical paradigm for interpretation of insurance contracts, this

court must first determine the intended scope and limitations of coverage under the insurance

policy issued by Hallmark to MTS.  The Hallmark policy contains a pollution exclusion clause

similar to those clauses contained in the policies at issue in Sullins and Clendenin.  The clause

defines "pollutants" as " any solid, liquid, gaseous, or thermal irritant or contaminant including

smoke, vapor, soot, fumes, acid, alkalis, chemicals and waste.  Waste includes material to be

recycled, reconditioned or reclaimed."  (Hallmark Exs. (ECF No. 90) Ex. B at 21.)  That

definition is virtually the same as the definition of "pollutants" contained in the policy at issue in

Clendenin, 889 A.2d at 390.  ("Pollutants include any solid, liquid, gaseous, or thermal irritant or

21

contaminant including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste.  Waste

includes material to be recycled, reconditioned or reclaimed.")  The definition in the Hallmark

policy is also similar to the definition of the term "pollutants" in <u>Sullins</u>. 667 A.2d at 618

(Pollutants include "a) vapors, fumes, acids, toxic chemicals, toxic liquids or toxic gasses; b)

waste materials or other irritants, contaminants or pollutants.").  Like the situation in <u>Sullins</u> and

<u>Clendenin</u>, the definition included in the Hallmark policy is ambiguous in its application to a

situation outside the scope of traditional environmental pollution.

### 1.  Ambiguity

First, a reasonably prudent person could consider petroleum asphalt an irritant or

contaminant while another could consider it neither.  The MSDS makes it clear that petroleum

asphalt can be harmful in certain circumstances, and, when considering these circumstances

(ingestion, contact with heated asphalt, overexposure to fumes), petroleum asphalt appears to be

an irritant and contaminant. (Hallmark Exs. (ECF No. 90) Ex. C.)  Petroleum asphalt in roadway

paving, however, seems less of an irritant or contaminant than manganese welding fumes or lead

paint, which have actually resulted in bodily injury and were still not considered irritants or

contaminants under Maryland law. <u>Clendenin</u>, 889 A.2d at 398-99; <u>Sullins</u>, 667 A.2d at 624.

Thus applying Maryland law, the court holds that the pollution exclusion clause is ambiguous in

its application to petroleum asphalt.  To hold otherwise would render the pollution exclusion

clause "virtually limitless, which we conclude could not have been the intention of either party."

<u>Clendenin</u>, 889 A.2d at 395.

Second, the court concludes that the clause is ambiguous in its application to a roadway

spill.  Hallmark's pollution exclusion clause includes a definition of "pollution" (Hallmark Exs.

(ECF No. 90) Ex. B) ("Pollution includes the actual, alleged or potential presence in or

introduction into the environment of any substance, including pollutants, if such substance has or

is alleged to have the effect of making the environment impure, harmful or dangerous.") and a

definition of "environment" (id.) (defining the environment as including "any air, land, structure

or the air therein, watercourse or water, including underground water").   Under these definitions,

a reasonably prudent person could consider a petroleum asphalt spill on a roadway to have made

the environment impure, harmful, or dangerous in light of the "environment" including structures

and the spill making the roadway (possibly a structure) harmful or dangerous to drivers.   A

reasonably prudent person, however, could also consider a petroleum asphalt spill on a roadway

to have nothing to do with the environment, viewing it as similar to any other trucking accident

which would also make a roadway harmful or dangerous, but would clearly be covered by

Hallmark's policy.   Thus, the court holds that the pollution exclusion clause is ambiguous in its

application to a roadway spill.

This finding of ambiguity is in line with Maryland courts' holdings with respect to

policies which contain absolute pollution exclusion clauses.   When analyzing such policies, the

Maryland Court of Appeals has found them to be ambiguous regarding their intended scope and

limitations of coverage in circumstances not involving traditional environmental pollution.[5]

Sullins, 667 A.2d at 624 (holding that a pollution exclusion clause was ambiguous with respect

---

[5] In Bernhardt, the Maryland Court of Special Appeals in a case involving carbon monoxide gas determined that a pollution exclusion clause barred coverage in a situation where traditional environmental pollution had not occurred. 648 A.2d at 57.  The court acknowledged that the title, "pollution exclusion," is ambiguous by itself but held that the language of the explanatory section to "a person of ordinary intelligence reading the language of this absolute pollution exclusion" covers carbon monoxide gas.  Id. at 55.  Bernhardt, however, does not persuade this court to decline to follow the court of appeals' holdings in Sullins or Clendenin.  In Clendenin the Maryland Court of Appeals distinguished Bernhardt because the plaintiff in Bernhardt conceded that carbon monoxide gas was a pollutant included under the pollution exclusion clause and  "a reasonably prudent person would not consider carbon monoxide anything but a harmful substance."  Clendenin, 889 A.2d at 395.  The same bases for distinguishing Bernhardt exist in this case.  In this case, like in Clendenin, the substance in issue – here, petroleum asphalt and in Clendenin, manganese – might not be generally considered by a reasonably prudent person "to be an irritant or contaminant."  Id.  MTS, like the plaintiff in Clendenin, did not agree that the substance in issue was a pollutant within the meaning of that term in the relevant policy.

to lead paint because environmental pollution did not occur); Clendenin, 889 A.2d at 398-99

(holding the same with respect to manganese welding fumes). In making this determination, the

court noted, "'[a]ny substance could conceivably be an "irritant or contaminant" under the right

circumstances.'" Id. at 396 (quoting Westchester Fire Ins. Co. v. City of Pittsburg, 794 F. Supp.

353, 355 (D. Kan. 1992)). Because no extrinsic or parol evidence was introduced in either

Sullins or Clendenin, the court construed the ambiguities against the insurers and determined that

the allegations in both cases did not fall under the scope of the pollution exclusion clauses

intended at the time of contracting. Clendenin, 889 A.2d at 398-99; Sullins, 667 A.2d at 624.

### 2. "Traditional Environmental Pollution"

In determining the scope of pollution exclusion clauses, the Maryland Court of Appeals

clearly outlined that those clauses only apply to cases of "traditional environmental pollution."

Clendenin, 889 A.2d at 398 (Md. 2006). The court, however, did not explicitly define

"traditional environmental pollution." In Sullins, the court noted that "'the terms used in the

pollution exclusion, such as "discharge," "dispersal," "release," and "escape," are terms of art

in environmental law which generally are used with reference to damage or injury caused by

improper disposal or containment of hazardous waste.'" Sullins, 667 A.2d at 620-21 (quoting

Atlantic Mut. Ins. Co. v. McFadden, 595 N.E.2d 762, 764 (Mass. 1992)). The court did not

define these terms of art to assist in the determination of what situations fall under the terms.

The court in Clendenin, 889 A.2d at 394, 397, likewise did not define "traditional environmental

pollution." The court applied the standard used by most courts, i.e., the "'We-know-it-when-we-

see-it' standard to determine what constitutes traditional environmental pollution." Conn.

Specialty Ins. Co. v. Loop Paper Recycling, Inc., 824 N.E.2d 1125, 1138 (Ill. App. Ct. 2005).

This standard provides little guidance to this court.  An analysis of the Maryland courts' reasoning will be helpful.

The Maryland Court of Appeals expressly held that the historical development of environmental pollution litigation provided the foundation for its disambiguation of pollution exclusion clauses.  That development played a decisive role in the Maryland courts' conclusion to limit the application of the pollution exclusion clauses to cases of traditional environmental pollution, see Clendenin, 889 A.2d at 397; Sullins, 667 A.2d at 622-23, and it assists this court in understanding what constitutes "traditional environmental pollution."  Before 1970, courts broadly interpreted the term "accident" and, later, the term "occurrence" in insurance policies to provide coverage for environmental pollution if it was "neither intended nor expected." 9 STEVEN PLITT, DANIEL MALDONADO, JOSHUA D. ROGERS, COUCH ON INSURANCE 3D § 127:3 (2008 Revised) (citing Am. States Ins. Co. v. Koloms, 687 N.E.2d 72, 80 (Ill. 1997)).  With the passage of the Clean Air Act[6], there was a drastic increase in environmental claims, id., and, in response, the insurance industry attempted to limit coverage through the inclusion of a pollution exclusion clause in general comprehensive liability policies.  Joshua E. Rosenkranz, Note, The Pollution Exclusion Clause Through the Looking Glass, 74 GEO. L.J. 1237, 1251-52 n.74 (1986); see Sullins, 667 A.2d at 622.  The pollution exclusion clause included the limitation that the exclusion did not apply where the pollution was "sudden and accidental"; the intent was for the insurance policy to provide coverage only in situations where pollution abruptly, unexpectedly and unintentionally occurred.  Rosenkranz, 74 GEO. L.J. at 1251-53.

The "sudden and accidental" language did not achieve the desired result of insurers, that being *exclusion* of coverage for *any and all* gradual environmental pollution.  Id. at 1253-54

_____

[6] 42 U.S.C. §§ 7401-31. By passing the Clean Air Act and its subsequent amendments, "Congress intended to impose national ambient air standards to be attained" and subsequently maintained. Train v. Natural Res. Def. Council, Inc., 421 U.S. 60, 86 (1975).

(noting that courts had expanded the scope of the sudden and accidental limitation within the pollution exclusion such that those policies had been held to cover even "gradual environmental losses caused by intentional, ongoing business operations" in some cases). With the passage of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601-30, high costs were imposed on companies for pollution cleanup, and companies turned to insurance policies for coverage.   PLITT, MALDONADO & ROGERS, supra, §127:3. As a result, the insurance industry resorted to the "absolute pollution exclusion" to exclude coverage for the high costs of government cleanup of long-term industrial environmental pollution. Id.; see Sullins, 667 A.2d at 622 ("[T]he industry's intention was to exclude . . . environmental pollution damage from coverage . . . ."). The newly-introduced absolute pollution exclusion clauses were intended to deny "coverage for 'bodily injury or property damage arising out of the actual, alleged or threatened discharge, release, or escape of pollutants' and defined 'pollutant' as 'any solid, liquid, gaseous or thermal irritant or contaminant including smoke, vapor, soot, fumes, acids, alkalies, chemicals and waste.'" Sullins, 667 A.2d at 622 (quoting Bernhardt, 648 A.2d at 1049-50).

The terms used in absolute pollution exclusion clauses are terms of art from environmental law, and the court concluded that "the industry's intention was to exclude only environmental pollution damage from coverage."   Id. at 515.   In Clendenin, the court noted that this analysis was in line with other courts' analyses of the development of pollution exclusion clauses.   Clendenin, 889 A.2d at 397. ("Our review of the history of the pollution exclusion amply demonstrates that the predominate motivation in drafting an exclusion for pollution-related injuries was the avoidance of the enormous expense and exposure resulting from the explosion of *environmental* litigation.") (quoting Am. States Ins. Co. v. Koloms, 687 N.E.2d 72,

81 (Ill. 1997) (internal quotations omitted) (emphasis in original)). "It appears from the foregoing discussion that the insurance industry intended the pollution exclusion to apply only to environmental pollution." Sullins, 667 A.2d. at 623.

Considering that the absolute pollution exclusion clause was drafted to avoid coverage of CERCLA-imposed cleanup costs, PLITT, MALDONADO & ROGERS, supra, § 127:3, traditional environmental pollution can be understood by addressing CERCLA or other similar federal and state environmental statutes.  CERCLA was enacted to cleanup hazardous waste sites and impose the costs of the cleanup on the party responsible.  United States v. CDMG Realty Co., 96 F.3d 706, 717 (3d Cir. 1996) (citing Tippins Inc. v. USX Corp., 37 F.3d 87, 92 (3d Cir. 1994); United States v. Alcan Aluminum, 964 F.2d 252, 257-58 (3d Cir. 1992)).  CERCLA liability is imposed where a hazardous substance is disposed of at a facility but is released into the environment; provided the release requires expenditure of "response costs" and the defendant is the responsible party (the current or prior owner of the facility or the individual delegated to transport, dispose of, or treat the substance).  Id. at 712-13 (citing 42 U.S.C. § 9607).  Under CERCLA, the "environment" is defined as "(A) the navigable waters, the waters of the contiguous zone, and the ocean waters . . . and (B) any other surface water, ground water, drinking water supply, land surface or subsurface strata, or ambient air within the United States or under the jurisdiction of the United States." 42 U.S.C. § 9601(8).  Viewed from this perspective, traditional environmental pollution may be defined as the release of a hazardous substance into the water, land, or air of the United States.

The petroleum asphalt spill in this situation does not appear to constitute traditional environmental pollution under this definition.  First, petroleum asphalt is not listed as a pollutant, contaminant, or hazardous substance under CERCLA, and, under the definition of "hazardous

27

substance," petroleum and petroleum-based products are specifically excluded, unless listed or

designated under other identified provisions. 42 U.S.C. § 9601(14). The asphalt spill did not

impact the environment – the water, land, or air – to the court's knowledge. It impacted a

roadway, the turnpike, which required a response by the Pennsylvania Turnpike Commission.

Spilling a non-hazardous substance on a roadway cannot equate to traditional environmental

pollution. No suit has been brought under CERCLA or any other similar federal or state

environmental statute in connection with the spill. If a claim arises that might qualify as

traditional environmental pollution, the court would assess it under this definition.

### 3. Use of Pollutants in Business Operation

In supplementing its analysis, the Maryland Court of Appeals found that a product could

not be a pollutant when used "during the normal course of business operations." Clendenin, 889

A.2d at 397. In Sullins, the court noted that "some courts have held that products, despite their

toxic nature, are not 'pollutants' or 'contaminants' when used intentionally and legally." 667

A.2d at 621 (citing W. Am. Ins. v. Tufco Flooring, 409 S.E.2d 692, 698 (N.C. App. 1991)

(holding that a resin used to resurface floors was not a pollutant when used "in [the] normal

business activity of resurfacing floors"); Regent Ins. Co. v. Holmes, 835 F. Supp. 579, 580, 582

(D. Kan. 1993) (holding that a solution composed of 88% formic acid was not a pollutant where

it was used for carpet dyeing but caused chemical burns when spilled); Karroll v. Atomergic

Chemetals Corp., 600 N.Y.S.2d 101, 102 (N.Y. App. Div. 2d Dept. 1993) (holding that a

pollution exclusion clause did not apply where a bulldozer operator was accidentally sprayed

with sulfuric acid)). In Sullins, 667 A.2d at 618-19, and Clendenin, 889 A.2d. at 389, the

incidents involved products used in their proper settings that released fumes causing bodily

harm. The decisions cited by the court in Clendenin show that the court did not intend to restrict

its analysis to situations where products were used properly; rather, the court implicated that pollution exclusion clauses should not be used to defeat the purpose of commercial liability insurance – coverage for legal business operations. <u>Clendenin</u>, 889 A.2d at 398 ("General commercial liability insurance coverage is obtained by the insured to protect itself against routine commercial hazards.") (citing <u>Tufco</u>, 409 S.E.2d at 697 ("If this Court accepted [the insurer's] interpretation of the CGL policy, we would be allowing an insurance company to accept premiums for a commercial liability policy and then hide behind ambiguities in the policy and deny coverage for good faith claims that arise during the course of the insured's normal business activity.")); <u>see</u> <u>Pipefitters Welfare Educ. Fund v. Westchester Fire</u>, 976 F.2d 1037 (7th Cir. 1992) ("Without some limiting principle, the pollution exclusion clause would . . . bar coverage for bodily injuries suffered by one who slips and falls on the spilled contents of a bottle of Drano . . . .").

     Here, the petroleum asphalt was being transported during the normal course of business operations for an asphalt trucking company.  While it was clearly not a normal business operation to spill accidentally the asphalt, it would never be the intention of a business to have an accident occur.  The purpose of a commercial liability policy is to provide coverage for accidental and unexpected occurrences.  The reasoning of the Maryland courts supports the conclusion that spilled petroleum asphalt on a roadway does not constitute traditional environmental pollution.

     Having found ambiguities in the application of the pollution exclusion clause contained in the policy issued by Hallmark and having determined that the proper scope of the clause is to exclude coverage for traditional environmental pollution, this court must construe the ambiguities against the drafter of the contract absent extrinsic evidence to clarify the true

intentions of the parties at the time of contracting.  <u>Cheney</u>, 556 A.2d at 1138.  Hallmark did not provide any extrinsic evidence.  The ambiguities remain regarding the scope of the clause and it must be construed against Hallmark as the drafter of the contract.  Therefore, the court holds that the pollution exclusion clause was only intended to apply to situations of traditional environmental pollution.

### B.  Allegations and Scope of the Policy

With the intended scope and limitations of the policy established, the court needs to address the second prong – determining whether the allegations in the present case potentially fall under the scope of the policy.  The allegations presented in Travelers' complaint and MTS' third-party complaint included numerous property damage claims and a claim for the cleanup costs of the turnpike by the Pennsylvania Highway Commission.  Because none of these claims were brought under CERCLA, the Clean Air Act, or other similar federal or state environmental laws to the court's knowledge, each of these allegations potentially falls under the scope of the policy.  Hallmark must defend and potentially indemnify MTS with respect to all those kinds of claims.   The pollution exclusion clause will only apply to bar coverage for present or future traditional environmental pollution claims brought against MTS.

### V.   CONCLUSION

Because there are no genuine disputes of material fact with respect to the petroleum asphalt spill or the insurance policy issued by Hallmark, MTS is entitled to declaratory judgment as a matter of law regarding Hallmark's obligation to defend and potentially indemnify MTS with respect to all claims resulting from the petroleum asphalt spill.  The issue is a question of

contractual interpretation, and the applicable law is that of the state of Maryland.  Under

Maryland law, a pollution exclusion clause like that present in the policy issued by Hallmark will

only bar coverage in cases of traditional environmental pollution.  Therefore, the court will

require Hallmark to defend and potentially indemnify MTS for all claims outside of the scope of

traditional environmental pollution claims.

       Accordingly, for the reasons set forth in this memorandum opinion the court will grant

MTS' motion for summary judgment and deny Hallmark's motion for summary judgment.   The

court will enter a declaratory judgment in favor of MTS.  An appropriate order follows.


                             By the court,

                             /s/ Joy Flowers Conti
                             Joy Flowers Conti
                             United States District Judge

Dated:  September 7, 2012